**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **AMPHONE PHOMMACHAK,** | ) | |
| **Petitioner,** | ) | |
| **v.** | ) | **Civil Action No. 25-13894-BEM** |
| **DAVID WESLING, et al.,** | ) | |
| **Respondents.** | ) | |

**<u>SHOW CAUSE ORDER</u>**

**MURPHY, J.**

Petitioner Amphone Phommachak is currently detained by U.S. Immigration and Customs Enforcement ("ICE"). Respondents state that his detention is pursuant to 8 U.S.C. § 1231(a)(6), which authorizes the detention of noncitizens subject to final orders of removal insofar as that detention is "reasonably necessary to secure removal." *Zadvydas v. Davis*, 533 U.S. 678, 699 (2001). Petitioner has provided "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future," which, if true, would mean that his detention is not authorized by the statute. *See id.* at 701. Under the normal habeas rules, Respondents therefore have an obligation to respond with facts addressing that initial showing. *See id.*

In their answer, Respondents assert that "ICE is prepared to effectuate Petitioner's removal order," *see* Dkt. 9 at 1, but cite as evidence only ICE's own "Notice of Revocation of Release," which merely states that Petitioner "can be removed from the United States," *see* Dkt. 9-2 at 1. This is insufficient. Accordingly, the Court will order Respondents, again, to show cause, no later than January 23, 2026, for why this Petition should not be granted, considering the legal conclusions set forth below.

# I. Background

## A. Factual Background

Petitioner arrived in the United States from Laos nearly four decades ago, on June 29, 1987. Dkt. 9-5 at 1. Petitioner states that his family was targeted by the Laotian government because they worked with Americans during the Vietnam War and that his parents were sent to a concentration camp for this reason and died there. Dkt. 1 at 7.

On April 14, 1998, Petitioner was ordered removed under 8 U.S.C. § 1227(a)(2)(A)(iii) based on an aggravated felony conviction. Dkt. 9-1 at 1–2; Dkt. 9-5 at 1. That order of removal became administratively final on March 23, 1999. Dkt. 9-3 at 1.

On January 9, 2004, Petitioner was released from immigration detention under an order of supervision "[b]ecause the [Government] ha[d] not effected [his] deportation or removal during the period prescribed by law."[1] *Id.* Respondents have not suggested that Petitioner ever violated any conditions of his release or that he poses any danger to the community. *See* Dkt. 9 at 5–6; *see also* Dkt. 12-1 (Petitioner's ICE check-in record). Petitioner reports that he is currently employed by an organization that supports young adults who have been involved with the criminal justice system and that helps them turn their lives around. Dkt. 12 ¶ 9.

Nearly twenty-two years later, on December 18, 2025, ICE detained Petitioner during a routine check-in. Dkt. 1 at 3. At that time, Petitioner was served with a "Notice of Revocation of Release," stating that his order of supervision had been revoked because of "changed circumstances in [Petitioner's] case." Dkt. 9-2 at 1. The Notice further states that "ICE has

---

[1] Based on the parties' recitation of the facts, the Court assumes that Petitioner was held in immigration detention during the almost five-year interim between his order of removal's becoming final and his release from immigration detention, from 1999 to 2004. *See* Dkt. 9 at 2; Dkt. 12 ¶ 10. However, the record is admittedly not entirely clear on this point. Conceivably, there may have been overlap with Petitioner's criminal sentence, or he might not have been immediately re-detained upon release.

determined that [Petitioner] can be removed from the United States pursuant to the outstanding order of removal against [him]" and that "ICE has determined that the purposes of [Petitioner's] release have been served and it is appropriate to enforce the removal order." *Id.*

The same day, Petitioner sought a writ of habeas corpus in this Court. Dkt. 1; *see also* Dkt. 12. Petitioner submits that his "removal to Laos, a country known for its reluctance to accept individuals with criminal records from the United States, is [no] more likely now than it was over twenty years ago" when the Government previously released Petitioner on an order of supervision. Dkt. 10 at 2; *see also* Dkt. 12 ¶¶ 32–36 (setting forth allegations of Laos's recalcitrance with respect to repatriation).[2]

### B. <u>Legal Background</u>

#### 1. <u>Section 1231</u>

The civil detention of noncitizens based on their final orders of removal is governed by 8 U.S.C. § 1231 ("section 1231"), which prescribes a 90-day "removal period," during which the Department of Homeland Security ("DHS") is required to carry out the removal. *Johnson v. Guzman Chavez*, 594 U.S. 523, 528 (2021) (quoting 8 U.S.C. § 1231(a)(1)(A)). "During the removal period, detention is mandatory." *Id.* (citing 8 U.S.C. § 1231(a)(2)). Under certain circumstances, including where an individual has been ordered removed based on a criminal conviction, DHS may further extend detention beyond the statutory removal period.[3] *See id.* at 528–29; 8 U.S.C. § 1231(a)(6).

---

[2] On this point, the Court notes that, less than a month ago, Laos was placed on a full travel ban, in part, because it has "historically failed to accept back its removable nationals." Procl. No. 10998, 90 Fed. Reg. 59,717 (Dec. 19, 2025); *see also* Procl. No. 10949, 90 Fed. Reg. 24,497 (June 10, 2025) (previously asserting the same and placing Laos on a partial travel ban).

[3] Respondents alternatively state that Petitioner qualifies for post-removal-period detention under section 1231(a)(6) "because he is inadmissible under 8 U.S.C. § 1182(a)(6)(A)(i) as Petitioner was neither admitted nor paroled in the United States upon entry." Dkt. 9 at 4. The Court notes that it has not found support for this statement in the record. *See* Dkt. 9-1 at 1–2; *see also* Dkt. 12 ¶ 6. However, either way, it is undisputed that Petitioner qualifies.

However, such extensions are limited. In *Zadvydas v. Davis*, 533 U.S. 678 (2001), the Supreme Court held, as a matter of statutory interpretation, that post-removal-period detention under section 1231(a)(6) cannot go beyond "a period reasonably necessary to bring about that alien's removal from the United States."[4] *Id.* at 689. Put another way, "[w]hether a set of particular circumstances amounts to detention within, or beyond, a period reasonably necessary to secure removal is determinative of whether the detention is, or is not, pursuant to statutory authority." *Id.* at 699. The *Zadvydas* Court further held that "[t]he basic federal habeas corpus statute grants the federal courts authority to answer [the] question" of whether a noncitizen's post-removal-period detention is authorized, *id.* (citing 28 U.S.C. § 2241(c)(3)), and that, "[i]n answering that basic question, the habeas court . . . should measure reasonableness primarily in terms of the statute's basic purpose, namely, assuring the alien's presence at the moment of removal," *id.* Where "removal seems a remote possibility at best," "preventing flight" is a "weak or nonexistent" justification. *Id.* at 690. "Thus, if removal is not reasonably foreseeable, the court should hold continued detention unreasonable." *Id.* at 699.

The *Zadvydas* Court further recognized that this is a complex and sensitive inquiry, touching on delicate areas of Executive "primacy," particularly as it relates to foreign policy, requiring courts to "take appropriate account of the greater immigration-related expertise of the Executive Branch, of the serious administrative needs and concerns inherent in the necessarily extensive INS efforts to enforce this complex statute, and the Nation's need to 'speak with one

[4] The decision in *Zadvydas* was substantially motivated by concern that a different reading of section 1231(a)(6) might offend the Due Process Clause of the Fifth Amendment. *See* 533 U.S. at 690–96. However, in *Clark v. Martinez*, 543 U.S. 371 (2005), the Supreme Court confirmed that *Zadvydas* was based on "the statute's text read in light of its purpose," rather than reflecting an as-applied constitutional challenge. 543 U.S. at 381, 385.

voice' in immigration matters."[5] *Id.* at 700. Nonetheless, the Supreme Court instructed that courts must "take appropriate account of such matters without abdicating their legal responsibility to review the lawfulness of an alien's continued detention." *Id.*

In order to "limit the occasions" when courts would need to make these kinds of "difficult judgments," the *Zadvydas* Court established a federal common law rule that detention under section 1231(a)(6) was presumptively reasonable during an initial "6–month period."[6] *Id.* at 700–01. "After this 6–month period, once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing." *Id.* at 701.

**2. <u>Habeas Proceedings</u>**

Because *Zadvydas*, in essence, authorizes and sets the terms for a certain type of habeas claim, it is worth remembering the baseline procedures that it acts upon.

Substantively, an application for a writ of habeas corpus under 28 U.S.C. § 2241 need only "allege the facts concerning the applicant's commitment or detention."[7] 28 U.S.C. § 2242; *see also* R. Gov. § 2254 Cases 2(c) (similarly requiring a petitioner to "specify all the grounds for relief available" and "state the facts supporting each ground").[8]

---

[5] *Zadvydas*, the Immigration and Nationality Act, and other immigration-related authorities from before 2003 occasionally refer to powers exercised by the Attorney General through the Immigration and Naturalization Service (INS) and its officers. *See, e.g.*, 8 C.F.R. § 241.4 (stating that the "Executive Associate Commissioner" and "district director" determine whether to "revoke release and return to Service custody an alien"). Those powers are now largely housed within DHS. *See Clark*, 543 U.S. at 375 n.1.

[6] The precise contours of this six-month period are discussed in greater detail below.

[7] Courts have compared this to the familiar Rule 12 standard. *See, e.g.*, *Walsh v. Boncher*, 652 F. Supp. 3d 161, 164 (D. Mass. 2023) ("A court examines a motion to dismiss a habeas petition according to the same principles as a motion to dismiss a civil complaint under Federal Rule of Civil Procedure 12(b)(6)." (internal quotation marks omitted)).

[8] "[A]ny or all" of the Rules Governing Section 2254 Cases in the United States District Courts may be applied to habeas petitions under 28 U.S.C. § 2241. *See* R. Gov. § 2254 Cases 1(b). The Court generally considers these rules instructive.

Upon receipt, a court must either "award the writ" or "issue an order directing the respondent to show cause why the writ should not be granted, unless it appears from the application that the applicant or person detained is not entitled thereto."[9] 28 U.S.C. § 2243. "The person to whom the writ or order is directed [must then] make a return certifying the true cause of the detention." *Id.*; *see also* R. Gov. § 2254 Cases 5(b)–(c) ("The answer must address the allegations in the petition. . . . The respondent must attach to the answer parts of the transcript that the respondent considers relevant.").

Assuming that the petition is not thereupon dismissed, "the power of inquiry on federal habeas corpus is plenary." *Townsend v. Sain*, 372 U.S. 293, 312 (1963), *overruled in part on other grounds by Keeney v. Tamayo-Reyes*, 504 U.S. 1, 5 (1992). For example, "the judge may direct the parties to expand the record by submitting additional materials relating to the petition." R. Gov. § 2254 Cases 7(a); *see also id.* 8(a) ("If the petition is not dismissed, the judge must review the answer . . . and any materials submitted . . . to determine whether an evidentiary hearing is warranted."). Indeed, broad discretion as to judicial inquiry remains the "basic rule" in habeas proceedings, *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Townsend*, 372 U.S. at 313), subject, however, to an important consideration: the appropriate "standards for granting federal habeas relief," including any "presumption[s]" established in law, *id.* at 473–74.[10] "In deciding whether to grant an evidentiary hearing"—or presumably any other exercise of a court's

[9] The statute states that an order to show cause "shall be returned within three days unless for good cause additional time, not exceeding twenty days, is allowed." 28 U.S.C. § 2243. This Court routinely sets an initial deadline beyond three days and liberally grants extension when requested, *see, e.g.*, Dkts. 4, 8, both in recognition of the unusually high number of immigration-related cases that the U.S. Attorney's Office has had to process recently and in hopes of receiving a fuller, more-productive response. While appreciating that these responses require fact-gathering and quick turnaround in an admittedly busy U.S. Attorney's Office, the Court is also cognizant that any delay results in the prolonged incarceration of an individual, possibly wrongly, at great personal cost.

[10] *Schiro* concerned standards and presumptions imposed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), not relevant here. *See* 550 U.S. at 473–74.

investigative power—"a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Id.* at 474.

Finally, to the extent any non-legal dispute remains, courts must "summarily hear and determine the facts, and dispose of the matter as law and justice require." 28 U.S.C. § 2243.

### 3. <u>Implementing Regulations</u>

In their answer, Respondents highlight the regulations governing ICE's decisions to continue detention beyond the removal period, order release on supervised terms, and revoke release, arguing that ICE's compliance with those regulations makes Petitioner's detention lawful. *See* Dkt. 9 at 5–9; *see also* 8 C.F.R. §§ 241.4, 241.13 ("section 241.4" and "section 241.13").

The regulations create at least two different species of release from post-removal-period detention. Under section 241.4, "[DHS] may release an alien under an order of supervision . . . if it determines that the alien would not pose a danger to the public or a risk of flight, without regard to the likelihood of the alien's removal in the reasonably foreseeable future." 8 C.F.R. § 241.13(b)(1). Alternatively, an order of release under section 241.13 may be based on a determination that there is "no significant likelihood of removal to the country to which he or she was ordered removed, or to a third country, in the reasonably foreseeable future." *Id.* § 241.13(a).

The procedures required to revoke each of these forms of release are different. An order of release under section 241.4 may be revoked either where an individual violates his conditions of release, 8 C.F.R. § 241.4(l)(1), or where it has been determined that revocation is in the public interest for reasons including that "[t]he purposes of release have been served" or that "[i]t is appropriate to enforce a removal order," *id.* § 241.4(l)(2). Alternatively, revocation of release that was ordered under section 241.13 requires "(1) an individualized determination (2) by ICE that, (3) based on changed circumstances, (4) removal has become significantly likely in the reasonably

foreseeable future." *Kong v. United States*, 62 F.4th 608, 619–20 (1st Cir. 2023) (citing 8 C.F.R. § 241.13(i)(2)).

## II. Discussion

Because Petitioner states a viable claim for habeas relief, Respondents are required to "address the allegations." *See* R. Gov. § 2254 Cases 5(b). Here that means, among other things, "respond[ing] with evidence" that there is a "significant likelihood of removal in the reasonably foreseeable future." *Zadvydas*, 533 U.S. at 701. In their most recent response, Respondents fail to make this showing, instead arguing, as a matter of law, that Petitioner's claim is foreclosed because his most recent detention has lasted fewer than six months, notwithstanding his prior detention and notwithstanding his more than two decades of supervised release. *See* Dkt. 9 at 9–11. For the reasons stated below, the Court rejects that argument.

In the absence of a substantial response, the Court might be justified in simply granting the Petition. However, the law "manifests a strong preference that cases be resolved on their merits." *Keane v. HSBC Bank USA for Ellington Tr., Series 2007-2*, 874 F.3d 763, 765 (1st Cir. 2017). Thus, the Court instead explains its reasoning and orders Respondents to answer accordingly.

### A. Reasonableness of Detention

*Zadvydas* instructs this Court to assess the reasonableness of Petitioner's detention in light of section 1231(a)(6)'s "basic purpose[:] . . . assuring [Petitioner's] presence at the moment of removal." *See* 533 U.S. at 699. Reasonableness, by its nature, is a fact-dependent inquiry that "depends on the totality of the circumstances in a given case." *Calandro v. Sedgwick Claims Mgmt. Servs., Inc.*, 919 F.3d 26, 36 (1st Cir. 2019).

The prospect of a fact-intensive inquiry under section 1231(a)(6) necessarily raises questions about how and whether to apply the pro-detention presumption set forth in *Zadvydas*. As other courts have noted, however, *Zadvydas* itself does not readily answer those questions in

cases, like Petitioner's, that fall outside its own specific fact pattern.[11] In particular, unlike Petitioner, the *Zadvydas* petitioners were *continuously* detained throughout their statutory removal periods and thereafter. *See* 533 U.S. at 684–85. Thus, the "6–month period" directly at issue in *Zadvydas* was simultaneously: (1) the six months immediately following the order of removal (*i.e.*, the 90-day "removal period" plus roughly three additional months); (2) the first six months of *total* detention; and (3) the first six months of the *current* detention.[12]

When these three are *not* identical—for example, where an individual is re-detained or where DHS failed to detain him during the statutory removal period—courts within this District and across the country have approached *Zadvydas* in a variety of ways to differing ends and with disparate levels of discussion.[13] *See, e.g.*, *Thai v. Hyde*, 788 F. Supp. 3d 57, 61 (D. Mass. 2025) (Gorton, J.) (appearing to measure the *Zadvydas* period from the date of re-detention) (denying petition);[14] *Siguenza v. Moniz*, 2025 WL 2734704, at *3 (D. Mass. Sept. 25, 2025) (Burroughs, J.) ("Most courts to consider the issue have concluded that the *Zadvydas* period is cumulative, motivated, in part, by a concern that the federal government could otherwise detain noncitizens indefinitely by continuously releasing and re-detaining them.") (collecting cases) (granting

---

[11] *See, e.g.*, *Cruz Medina v. Noem*, 794 F. Supp. 3d 365, 374 (D. Md. 2025) ("[*Zadvydas*] raises two questions . . . : What does it mean for detention to be 'presumptively' reasonable? And when does that six-month period run?").

[12] More accurately, the statutory removal period "begins on the latest of three dates: (1) the date the order of removal becomes 'administratively final,' (2) the date of the final order of any court that entered a stay of removal, or (3) the date on which the alien is released from non-immigration detention or confinement." *Johnson v. Guzman Chavez*, 594 U.S. 523, 528 (2021) (citing 8 U.S.C. § 1231(a)(1)(B)).

[13] The Court notes that, as to belated detention, at least one district court has recently held that DHS has *no* authority to arrest an individual after the statutory removal period has expired. *See Diallo v. Joyce*, 2025 WL 3718477, at *2–4 (S.D.N.Y. Dec. 23, 2025) (holding that section 1231(a)(6) permits only "*continued* detention," *i.e.*, detention extending directly out of removal-period detention under section 1231(a)(2), positing that "the [*Zadvydas*] Court took as a given that [detention under section 1231(a)(6)] follows immediately after the ninety-day removal period").

[14] In *Thai*, the petitioner was detained for fewer than four months total. *See* 788 F. Supp. 3d at 59, 61 (stating that the petitioner was detained for three months in 2012 and then seventeen days in 2025). As such, it arguably did not matter that the court measured the length of the petitioner's *current* detention, as compared to measuring the length of *total* detention, as both were under six months.

petition); *Walker v. Gillen*, 2010 WL 817206, at *1 (D. Mass. Mar. 3, 2010) (Tauro, J.) ("The six-month [*Zadvydas*] period represents the presumptive outer limit on detention pending removal and is, therefore, calculated from the date that the removal period begins to run.") (denying petition after concluding that detention under section 1231(a)(6) had not yet begun).

In this case, Respondents argue that Petitioner's "claim fails because any *Zadvydas* challenge cannot be raised until Petitioner has been detained for six-months in post-final order custody and here he has been detained for less than two weeks." Dkt. 9 at 11. There are two separable elements to this argument. First, Respondents posit that *Zadvydas* forecloses "any" habeas challenge to detention under section 1231(a)(6) before the expiration of the *Zadvydas* six-month period. *Id.* Next, they suggest that the six-month period should be measured by the date of Petitioner's re-detention. *Id.*

Before considering these points individually, it is worth recognizing what their cumulative effect would be: the Government could detain a person under section 1231(a)(6) for just short of six months, release him, re-detain him the next day, and never be subject to a habeas challenge. *See Siguenza*, 2025 WL 2734704, at *3 (recognizing this implication).

Taken separately, Respondents' positions fare no better. First, any reading of *Zadvydas* that treats less than six months' detention as "*conclusively* reasonable," and thus automatically authorized under section 1231(a)(6), "runs headlong into the Supreme Court's clear articulation of its holding as adopting a *presumption* of reasonableness before the six-month period expires. A presumption is just that: a default, a starting point." *Cruz Medina v. Noem*, 794 F. Supp. 3d 365, 374 (D. Md. 2025) (emphases in original). Further, and at a more fundamental level, Respondents' argument appears to be based on the false notion that a violation of this kind cannot have *occurred* until six months have passed. *See* Dkt. 9 at 11 (quoting *Rodriguez-Guardado v. Smith*, 271

F. Supp. 3d 331, 335 (D. Mass. 2017) ("As petitioner has been detained for approximately two months as of this date, the length of his detention does not offend due process.")). This is akin to saying that a murder cannot have happened until there is a conviction due to the presumption of innocence. Rather, detention under section 1231(a)(6) is unauthorized and so unlawful as soon as it is no longer "reasonably necessary to bring about that alien's removal." *Zadvydas*, 533 U.S. at 689. *Zadvydas* may have shifted the epistemological landscape within which courts can make that finding, but there is nothing in *Zadvydas* to suggest that the Government is entitled to detain a person other than as permitted under the statute. Accordingly, "[b]oth during the six-month period and after, a district court has an ongoing 'obligation to determine whether detention remains authorized.'" *Douglas v. Baker*, — F. Supp. 3d —, 2025 WL 2997585, at *2 (D. Md. Oct. 24, 2025) (quoting *Cruz Medina*, 794 F. Supp. 3d at 372).

Respondents' second step—ignoring Petitioner's prior detention and the decades that have elapsed since his removal period expired, instead measuring his six-month *Zadvydas* period based on his most recent detention—rips *Zadvydas* from its stated context: "continued detention." *See* 533 U.S. at 685, 686, 699, 700, 702. This is always a suspect move when dealing with common law presumptions because, as the Supreme Court has put it: "Context counts." *Env't Def. v. Duke Energy Corp.*, 549 U.S. 561, 576 (2007); *see also Zadvydas*, 533 U.S. at 699 (citing 1 EDWARD COKE, INSTITUTES OF THE LAWS OF ENGLAND 70b for the maxim that, "[when] the rationale of a legal rule [is] no longer . . . applicable, that rule itself no longer applies").

Here especially, considering the rationale behind *Zadvydas*'s presumption demonstrates why it cannot be wholesale imported into other detention fact patterns. "Generally, . . . the most important consideration in the creation of presumptions is probability." 2 MCCORMICK ON EVIDENCE § 343 (8th ed. 2020). In this regard, the *Zadvydas* presumption can be understood as a

plausible statement of likelihood: detention during the first six months following an order of removal is run-of-the-mill and thus insufficiently indicative on its own to suggest that anything unlawful is occurring. *Cf. Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 56–58 (1991) (adopting presumption, based on lower court estimate of time needed to process arrestee, that 48-hour delay in probable-cause hearing after arrest is reasonable, hence constitutionally permissible) (cited in *Zadvydas*, 533 U.S. at 701). Of course, this particular statement of probability tells us little about the case of someone like Petitioner, who was detained for five years, released for twenty-two years, and has now been re-detained for about a month.[15]

The same applies if one thinks about *Zadvydas* in terms of "fairness" and "policy." *See* 2 MCCORMICK ON EVIDENCE § 343 (8th ed. 2020); *cf. Cheff v. Schnackenberg*, 384 U.S. 373, 379–80 (1966) (adopting rule that right to jury trial extends to all cases in which sentence of six months or greater is imposed) (cited in *Zadvydas*, 533 U.S. at 701). Indeed, the *Zadvydas* Court was clearly engaged with the proper balance between these factors in its varied discussions of the "fairness encompassed in due process of law," 533 U.S. at 693 (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953)); the "greater immigration-related expertise of the Executive Branch," *id.* at 700; courts' "legal responsibility to review the lawfulness of an alien's continued detention," *id.*; and the "uniform administration" of federal courts, *id.* at 701. In this sense, *Zadvydas*'s six-month presumption can be understood as a compromise between competing concerns, one that is upset when unseated from its context without proper consideration.

---

[15] Alternatively, to the extent one might feel it appropriate to assert a *different* probabilistic statement covering fact patterns outside continuous detention where current or total detention is under six months, that would necessarily be the underpinning for a *new* presumption, requiring its own justification and adoption, rather than a mere application of *Zadvydas*.

By contrast, the Court's line of reasoning would take *Zadvydas* at face value: where, as in *Zadvydas*, a noncitizen has been detained for fewer than six months following his order of removal (or whatever event triggers the statutory removal period), the Government is entitled to a presumption that detention under section 1231(a)(6) is reasonable. *Id.* at 700–01. In any other circumstance, there is no special presumption, and the normal habeas rules apply, absent a separate conclusion that *Zadvydas* should be extended in the typical common law manner.

Consider a prototypical case, which the above reading of *Zadvydas* covers: DHS will have detained an individual for their 90-day removal period, as required by statute. *See* 8 U.S.C. § 1231(a)(2). Thereafter, if DHS chooses to continue detention, it is pursuant to section 1231(a)(6) and subject to habeas inquiry. *Zadvydas*, 533 U.S. at 699. In seeking habeas relief, the average petitioner will have no greater insight into the status of his removal than the length of his detention, and so that is realistically all he will be able to plead. If fewer than six months have passed—and assuming he pleads no other facts demonstrating that his detention is not reasonably tethered to the purpose of section 1231(a)(6)—then *Zadvydas*'s pro-detention presumption kicks in, and the petition is facially insufficient, meaning that the court has no obligation to pursue it.[16] *Cf. Schriro*, 550 U.S. at 473–74 (directing courts to consider applicable standards for relief, including any evidentiary presumptions, in deciding whether further consideration of a habeas petition is necessary); *see also* R. Gov. § 2254 Cases 4 ("If it plainly appears from the petition and any attached exhibits that the petitioner is not entitled to relief in the district court, the judge must dismiss the petition.").

[16] Because the *Zadvydas* presumption does not apply in Petitioner's case, there is no occasion to consider what might be required to overcome it at the pleading stage.

The *Zadvydas* presumption, as outlined above, is a huge benefit to the Government (and to judicial economy) because, without it, the fact of discretionary, civil detention might alone be sufficient to trigger a court's obligation to inquire into "the true cause of the detention."[17] *See* 28 U.S.C. § 2243; *see also id.* § 2242 (requiring only that a petition "allege the facts concerning the applicant's commitment or detention, the name of the person who has custody over him and by virtue of what claim or authority, if known"). Even if the fact of detention alone were found to be insufficient, in the absence of *Zadvydas*, courts would be left to wonder at what point detention becomes sufficiently suspect to warrant a reasonable inference that relief could be appropriate. *See Zadvydas*, 533 U.S. at 701 (adopting its presumption "for the sake of uniform administration in the federal courts"). Surely, this would lead to the precise kind of routine invasiveness that the *Zadvydas* Court hoped to avoid. Thus, by neutralizing the central allegation for a wide swath of the most paradigmatic claims, *Zadvydas* accomplishes exactly what the Supreme Court set out to do: "limit the occasions when courts [would] need to" decide the reasonableness of detention under section 1231(a)(6), thereby reducing courts' intrusion into matters of "Executive Branch primacy." *Id.* at 700–01.

In the absence of any presumption to apply, the Court finds that the circumstances of Petitioner's re-detention, including his long period of release and the Government's past difficulty in removing him, constitute "good reason to believe that there is no significant likelihood of

[17] Even without a specific presumption of reasonableness, the Government has a substantial advantage in these cases. As *Zadvydas* reminds, courts must "listen with care when the Government's foreign policy judgments, including, for example, the status of repatriation negotiations, are at issue, and . . . grant the Government appropriate leeway when its judgments rest upon foreign policy expertise." 533 U.S. at 701. Notably, this instruction necessarily lives outside *Zadvydas*'s six-month presumption because the entire point of that presumption is to "limit the occasions" when courts would have to review that kind of evidence. *Id.*

removal in the reasonably foreseeable future."[18] *Id.* Accordingly, Respondents are required to "address the allegations." *See* R. Gov. § 2254 Cases 5(b).

### B. Procedures for Revocation

Respondents themselves highlight their purported compliance with the regulations as authorizing the revocation of Petitioner's order of release. *See* Dkt. 9 at 5–9. However, the Court has some doubts, which Respondents must likewise address in their response.

Respondents assert that they followed the procedures in section 241.4(l). *See id.* at 5. However, those apply only where release was based on a determination "that the alien would not pose a danger to the public or a risk of flight" rather than "the likelihood of the alien's removal in the reasonably foreseeable future." 8 C.F.R. § 241.13(b)(1). In the latter case, the procedures in section 241.13 apply and require "(1) an individualized determination (2) by ICE that, (3) based on changed circumstances, (4) removal has become significantly likely in the reasonably foreseeable future."[19] *Kong*, 62 F.4th at 619–20 (citing 8 C.F.R. § 241.13(i)(2)).

Given Petitioner's felony conviction, his Laotian background, and the timing of his 2004 release (post-*Zadvydas* and following up to five years of immigration detention), it seems very possible, if not likely, that Petitioner was released because it was determined that his removal was not foreseeable, not because the Government suddenly found favor in him. *See* Dkt. 9-3 at 1 (ordering release "[b]ecause the Service ha[d] not effected [Petitioner's] deportation or removal during the period prescribed by law").[20] If so, Respondents should include the record for

---

[18] The Court reads *Zadvydas*'s "good reason" instruction consistent with general habeas pleading standards. However, insofar as it might be read to express a higher threshold, the Court would likely find Petitioner meets it.

[19] The Court notes that the form used to record Petitioner's "informal interview upon revocation of [his] order of supervision" references both sections 241.4 and 241.13. *See* Dkt. 9-2 at 3 (emphases removed).

[20] *But see* Dkt. 12 ¶ 13 (alleging that, in issuing the order of release, ICE "made a determination that [Petitioner] [was] neither a flight risk nor a danger to the community").

Petitioner's "individualized determination," *Kong*, 62 F.4th at 619, in their new response, not least because it is directly relevant to the Court's inquiry under *Zadvydas*.[21] If no such determination was made but was required under section 241.13, then Respondents should state their position regarding how the Court should handle that procedural shortcoming.

## III. Conclusion

As explained herein, Respondents are ORDERED to show cause in writing by January 23, 2026 for why this Petition should not be granted.

**So Ordered.**

/s/ Brian E. Murphy
Brian E. Murphy
Judge, United States District Court

Dated: January 20, 2026

[21] Indeed, Section 241.13 was adopted specifically to facilitate the Government's compliance with *Zadvydas*. *Continued Detention of Aliens Subject to Final Orders of Removal*, 66 Fed. Reg. 56,967 (Nov. 14, 2001); *Execution of Removal Orders; Countries to Which Aliens May Be Removed*, 70 Fed. Reg. 661 (Jan. 5, 2005).